NOT FOR PUBLICATION                          [Dkt. Ents. 46, 51]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

MARY E. DEMARY,

     Plaintiff,

        v.

KENNEDY HEALTH SYSTEM,

     Defendant.

Civil Action No. 11-05984
(RMB/JS)

**OPINION**

Appearances

James M. Carter, Esquire
Hoffman DiMuzio
4270 Route 42
Turnersville, New Jersey 08012
     Attorneys for Plaintiff

Patricia A. Stone
Amy L. Bashore
Ballard Spahr LLP
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1163
     Attorneys for Defendant

**BUMB**, United States District Judge:

This matter comes before the Court upon two motions filed by Defendant Kennedy University Hospital, improperly pled as Kennedy Health System, (the "Defendant" or "Kennedy"),[1] a motion for summary judgment (Dkt. Ent. 46) and a motion to strike

---

[1] Plaintiff does not contest that Kennedy University Hospital is the proper defendant.

1

Plaintiff's opposition to the motion for summary judgment and for associated fees (Dkt. Ent. 51). For the reasons that follow, the Court grants the motion for summary judgment, denies the motion to strike but will award attorneys' fees in the amount of $1,200.

## I.   Factual Background

Kennedy is a healthcare provider that operates three separate hospital campuses in southern New Jersey: Stratford, Washington Township, and Cherry Hill. (Defendant's Statement of Material Facts ("DSMF") ¶¶ 1-3, Dkt. Ent. 46; Plaintiff's Counterstatement of Material Facts ("PCSMF") ¶ 1, Dkt. Ent. 50.[2]) The Washington Township hospital contains the largest emergency department in the region, providing care for nearly 200 patients per day and employing nearly 123 staff members. (DSMF ¶¶ 3-5.) By contrast, the Stratford hospital is approximately half the size of the Washington Township hospital, with half the number of patients and staff. (DSMF ¶ 6.) Plaintiff does not dispute that the physicians and nursing staff at Washington Township are separated, "requiring staff to be proactive in interacting with, getting information from and giving information to the

---

[2] Rather than specifically admitting or denying Defendant's material facts, Plaintiff includes a blanket provision stating "Unless otherwise noted herein, all of the facts listed in the [DSMF] are undisputed by the plaintiff." (Id.)

physicians" while the Stratford nurses and physicians share desk space. (Id. at ¶¶ 8-9.)

In September 2001, Alice Farrell ("Farrell") hired Plaintiff Mary E. DeMary (the "Plaintiff"), who is often referred to as Lisa (see id. at n.2), to be a Registered Nurse at Kennedy's Stratford hospital campus. (Id. at ¶ 11; Ex. A to DSMF ("Pl.'s Dep.") 30:8-12.) Except for a brief period of time from September 2003 to December 2004,[3] Plaintiff spent her years of employment at the Stratford hospital. (DSMF ¶ 12 & n.1.)

In addition to hiring Plaintiff initially, Farrell supervised Plaintiff from 2001 to 2009. (Id. at ¶ 13.) During that time, Farrell consistently rated Plaintiff as meeting or exceeding expectations. (Id. at ¶¶ 13-14.)

- "Lisa, you have been a fabulous addition to our ED [Emergency Department] team. I am so glad you joined us. I appreciate the experience & expertise you brought to us. . . . I am very glad you are here." (Ex. C to DSMF (2001 Review); Pl.'s Dep. 35:8-15; DSMF ¶ 14.)

- "Lisa[,] we again welcome you back to our department. You have much experience and proficiency to compliment our department mix. You are well respected by your peers and physicians alike. Thank you for a great job!" (Ex. E to DSMF (2005 Review), at 8; Pl.'s Dep. 44:7-45:8.)

- "Lisa, it has been a very good year. . . . Lisa is a very good clinician with very good skills and knowledge. You have moved into [the] charge nurse

---

[3] During this time, Plaintiff worked as an interventional radiology nurse traveling among Kennedy's three locations. (DSMF ¶ 11; Pl.'s Dep. 41:1-42:18.)

> role very well, you have good communication skills
> and you are working well with staff in this role.
> Thank you for a great year." Ex. G to DSMF (2008
> Review), at 8; Pl.'s Dep. 52:8-15; DSMF ¶ 14.)[4]

Plaintiff also testified that she "truly enjoy[ed] working under Alice and [] our ED family." (Ex. F to DSMF, at 7.) In fact, Plaintiff testified that she found Farrell supportive and understanding, especially during 2007, which was a difficult year for Plaintiff due to personal reasons. (DSMF ¶¶ 15-16; Pl.'s Dep. 49:4-50:21.)

Farrell also "rehired" Plaintiff at least twice. In 2002, Plaintiff was terminated because she was unable to return from leave within a 30-day window. (See Pl.'s Dep. 37:15-38:8.) When Plaintiff sought to return, Farrell rehired her into the same position that she had previously held. (Id.) Then, while an interventional radiology nurse in 2004, Plaintiff applied to return to a position in the Stratford ED. (Id. at 42:15-43:24.) Farrell approved Plaintiff's application. (Id.; see also DSMF ¶¶ 17-18.) In addition, in 2006, Farrell promoted Plaintiff to Charge Nurse, which Plaintiff acknowledged was a position awarded to only "reliable, high-performing nurses." (See id. ¶ 19; Pl.'s Dep. 48:1-5; Ex. B to DSMF ("Farrell Cert.") ¶ 20.)

In 2009, Farrell again promoted Plaintiff when an Assistant Nurse Manager ("ANM") position became available at Kennedy's

---

[4] See also Exs. D, F to DSMF.

Washington Township ED. (Farrell Cert. ¶ 21, 24.) ANMs are
responsible for managing the flow of patients by using their
clinical experience to facilitate patient assessment, care,
discharge or transfer, and, as needed, to provide direct patient
care. (DSMF ¶ 27.) ANMs also provide guidance to staff regarding
standards of care, practice policies, and procedures. (Id. at
¶ 28.) ANMs in the Emergency Department all devote substantial
time, as needed, to rendering clinical care along with the staff
nurses. (Id. at ¶ 43.)

   Although Plaintiff was less qualified for the ANM position
than the other applicant, Farrell nonetheless hired her.
Plaintiff and another employee, Lea Ann Kellum ("Kellum"), had
applied for the ANM position initially. (DSMF ¶ 20; Farrell
Cert. ¶ 22.) Kellum, a Caucasian, had prior experience as an ANM
and was employed at that time at the Washington Township ED.
(See Farrell Cert. ¶ 23; see also DSMF ¶ 21; Pl.'s Dep. 58:8-
59:14.) Plaintiff, on the other hand, had no experience as an
ANM or with the Washington Township ED or staff.[5] (Id.; Pl.'s
Dep. 55:1-18.) Although Kellum was more qualified than
Plaintiff, Farrell selected Plaintiff because she "believed that
[Plaintiff] brought energy to the position and demonstrated

---

[5] Although Plaintiff had worked at the Washington Township
facility, she had not interacted with many staff and had not
worked with the ED specifically.

motivation to learn the position and because she made a
favorable impression with the staff members" involved in the
interview process. (Farrell Cert. ¶ 24.) Plaintiff began as an
ANM on May 24, 2009. (DSMF ¶ 24.) Kellum was hired approximately
one month later when another ANM positioned opened up. (Id. at
¶¶ 21-25.)

New ANMs are given hands on training and, since Plaintiff
and Kellum were hired in short succession, Farrell decided to
have their schedules overlap with her own so that they might be
able to observe Farrell performing the job duties of the
position. Because, however, their backgrounds differed, Farrell
tailored their specific training and work schedules. (Id. at
¶¶ 30-32.) Plaintiff received additional training including an
out of state multi-day leadership training program and one-on-
one training in Kennedy's time keeping and attendance system.
(Id. at ¶¶ 33-34.) Due to their vacation schedules, Ferrell and
Plaintiff's work schedules only overlapped for six weeks.

Plaintiff served as an ANM from May 29, 2009 until August
3, 2009, Plaintiff's last day of work.[6] (Id. at ¶ 36.) Plaintiff
contends that Farrell discriminated against her during this time
by providing Plaintiff with a hard copy schedule for only two of

---

[6] Plaintiff does not assert that her termination constituted
an adverse employment action for purposes of her discrimination
claim.

her six weeks of work while providing Kellum with a hard copy
schedule for six weeks or so of work. (See id. at ¶ 37.)
Plaintiff acknowledges, however, that she had access to her
schedule on the computerized system "in theory", but she did not
have the opportunity to log on because the job assignments given
to her by Farrell kept her on the floor with patients instead of
in the office. (PCSMF ¶ 2.) Plaintiff also contends that she was
discriminated against in that she was given more patient care
assignments than Kellum and did not receive appropriate
training. Specifically, she did not learn how to create
schedules for the associates she supervised. (DSMF ¶¶ 39-40).
Plaintiff testified, however, that she had asked Farrell to
rotate her through the different nursing positions so that she
could learn the layout of the ED and meet the staff. (Pl.'s Dep.
83:4-94:8; PCSMF ¶ 3.) Although Farrell granted this request,
Plaintiff argues that it was only supposed to be for one week.
(PCSMF ¶ 3.)

## II.  Procedural Background

Plaintiff commenced this action, alleging racial
discrimination under Title VII. On December 12, 2013, Defendant
filed the instant motion for summary judgment. Under Local Civil
Rule 7.1, Plaintiff's opposition was due on or before December
23, 2013. Four days after this deadline had passed, Plaintiff
sought an automatic extension of the due date under Local Civil

7

Rule 7.1(d)(5). (Dkt. Ent. 47.) Although the request was
untimely, the Clerk's Office granted it, making Plaintiff's
opposition due January 7, 2014. Plaintiff, however, did not file
her opposition until January 15, 2014. (See Dkt. Ent. 50.) Nor
did she timely seek another extension of her deadline.
Accordingly, Defendant filed a motion to strike Plaintiff's
opposition and for fees. To date, Plaintiff has not responded to
the motion.

### III.   Motion to Strike and Request for Attorneys' Fees

The Court will first address Defendant's motion to strike
as untimely Plaintiff's opposition to Defendant's motion for
summary judgment or, in the alternative, for fees amounting to
$3,551.50. (See Reply, Dkt. Ent. 53 at 6.) Under Local Civil
Rule 7.1(d)(7), "[t]he Court may reject any brief or other paper
not filed within the time specified." As noted above, Plaintiff
filed her opposition brief eight days late and without
requesting an extension of the deadline. The Court is aware of
Plaintiff's counsel's unacceptable behavior, i.e., counsel's
failure to adhere to other Court directives and deadlines in
this litigation. Indeed, United States Magistrate Judge Joel
Schneider entered an Order addressing Plaintiff's counsel's
prior dilatory behavior just days before Plaintiff again missed
a deadline. (See Jan. 2, 2014 Order, Dkt. Ent. 49.) However,
because the Court finds summary judgment in favor of Defendant

is warranted even considering Plaintiff's opposition brief, it will deny Defendant's motion to strike.

Defendant has also requested an award of attorneys' fees. Defendant first requests the fees incurred in connection with the filing of its July 25, 2013 motion to dismiss for failure to comply with discovery obligations. (See Dkt. Ent. 29.) However, Judge Schneider has already denied that fee application and the Court will not now re-decide the issue simply because Plaintiff's counsel has missed another deadline.

Defendant also seeks fees amounting to $2,015.50, incurred in filing the motion to strike Plaintiff's opposition. (Reply at 6.)[7] Although Plaintiff's counsel received electronic notice of Defendant's motion to strike and request for attorneys' fees, and was provided the opportunity to respond to that motion, counsel failed to do so. The Court then issued a text order addressing the motion to strike and setting a new deadline for Defendant's reply to Plaintiff's out-of-time opposition brief:

> This matter comes before the Court upon the Defendant's Motion for Summary Judgment [Docket No. 46], and Motion to Strike [Docket No. 51], and it appearing that Plaintiff's opposition to the Motion for Summary Judgment was filed out of time; and it further appearing that Plaintiff has failed to respond to the Motion to Strike; and it further appearing that Plaintiff's counsel's dilatory conduct has been addressed by Judge Schneider; and the Court further noting that it intends to impose sanctions, It is hereby ORDERED as follows: Defendant may file a reply

---

[7]

9

brief on or before April 28, 2014 that addresses the
motion for summary judgment. Defendant shall also
advise the Court in its reply what the appropriate
sanction should be other than the striking of the
opposition brief.

(Dkt. Ent. 52.) Despite providing Plaintiff's counsel with

notice of its intent to impose sanctions, the Court still

received no response from Plaintiff's counsel. Under Federal

Rule of Civil Procedure 37(b)(2)(C), "the Court may order the

responsible party, or its attorney, to pay the costs, including

reasonable attorney's fees, caused by the violation. Fed. R.

Civ. P. 37(b)(2)(C). At all times, the decision whether or not

to levy sanctions, as well as what form those sanctions may

take, is committed to the sound discretion of the district

judge." Rodriguez v. Hayman, No. 08-4239, 2013 WL 3772525, at *2

(D.N.J. July 17, 2013). "The rule's purposes are to:

(1) penalize the culpable party or attorney; (2) deter others

from engaging in similar conduct; (3) compensate the court and

other parties for the expense caused by the abusive conduct; and

(4) compel discovery and disclosure." Int'l Paper Co. v. Rexam,

Inc., No. 11-6494, 2013 WL 3043638, at *7 (D.N.J. June 17, 2013)

(citations omitted).

As a result of Plaintiff's noncompliance with the deadline

for submitting her opposition, Defendant filed the instant

motion to strike, as it is permitted to do. Defendant argues

that Plaintiff's late filing is yet another example of counsel's

10

dilatoriness[8] and demonstrates that "the assurances Plaintiff's counsel gave to Magistrate Judge Schneider on September 19, 2013 amount to mere lip service." (Mot. to Strike at 6.) The Court finds that, under the circumstances, a sanction in the form of an award of reasonable attorneys' fees is justified. In denying Defendant's previous request for attorneys' fees, Judge Schneider explained that "[t]he fact that plaintiff's counsel was admonished on the record should be enough of an incentive for him to comply with all future Court Orders. . . . Plaintiff's counsel is on notice that in the future similar conduct will not be treated leniently." (Jan. 2, 2014 Order at 2.) Despite being on notice that future dilatory behavior would not be tolerated, just five days later, Plaintiff's counsel again allowed a filing deadline to pass without seeking an extension. Moreover, despite being presented with multiple opportunities to respond to Defendant's requests for fees, counsel has failed – to this date – to provide any justification for his conduct. The responsibility for Plaintiff's failure to timely file an opposition clearly lies with Plaintiff's counsel, not Plaintiff. Had it been due to any conduct on behalf of

---

[8] Defendant has set forth at great length in its brief the tardy behavior of Plaintiff and her counsel. (Mot. to Strike, Dkt. Ent. 51, at 2–5.) However, Plaintiff's counsel acknowledged before Judge Schneider that Plaintiff bore no responsibility for the failure to comply with the Court's Orders. (Dkt. Ent. 49 at n.1.)

11

Plaintiff, the Court would expect to have received a request for
an extension from Plaintiff's counsel. No such request was
filed. Accordingly, the Court will award Defendant attorneys'
fees.

The Court must now determine the appropriate amount of
attorneys' fees to award. In calculating reasonable fees, courts
typically use the lodestar method, which multiplies the
attorney's reasonable hourly rate by the number of hours
reasonably spent. See, e.g., Wachtel v. Health Net, Inc., No.
01-4183, 2007 WL 1791553, at *2 (D.N.J. June 19, 2007); F.T.C.
v. Circa Direct LLC, 912 F. Supp. 2d 165, 171 (D.N.J. 2012).

Defendant seeks fees amounting to $2,015.50, which consists
of 5.7 hours spent by Mark Kowal, an associate, and .5 hours
spent by Patricia Smith, a partner. (Ex. A to Reply.) To begin
with, although Defendant is certainly entitled to seek the
relief requested, a brief letter memorandum, rather than a
seven-page memorandum attaching nearly 35 pages of exhibits,
would have sufficed given the straight-forward nature of
Defendant's request and the extensive discussion of Plaintiff's
counsel's misconduct set forth in Defendant's prior papers (see
Dkt. Ents. 23-1, 29-1, 35, 36) and Court Orders (see, e.g., Dkt.
Ent. 37). Accordingly, the Court will credit Kowal with only
one-half of the time requested, 2.8 hours for drafting and

revising the memorandum. As to Smith's hours, the Court finds that .5 hours is reasonable.

As to the reasonableness of the billing rates, Kowal's billing rate is $350/hour and Smith's is $440/hour. "[A] reasonable hourly rate should be determined by examination of the prevailing market rate in the relevant community at the time of the fee petition, not the time the legal services were performed. A court should assess the skill and experience of the . . . attorneys and compare their rates to the rate prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." L.J. v. Audubon Bd. of Educ., 373 F. App'x 294, 296 (3d Cir. 2010) (quotations and citation omitted). The party seeking to recover attorney's fees has the "initial burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case." Id. That burden is ordinarily met through the submission of "affidavits prepared by other attorneys in the relevant legal community." Access 4 All, Inc. v. Boardwalk Regency Corp., No. 08-3817, 2012 WL 3627775, at *4 (D.N.J. June 28, 2012). Where that initial burden is met, the burden shifts to the party disputing the fees to rebut the reasonableness of the proposed fees. T.B., 2012 WL 1079088, at *3.

13

Defendant submitted an affidavit from Kowal attesting to the reasonableness of Smith's rate of $440/hour and Kowal's (apparently previous) rate of $315/hour based upon a 2012 National Law Journal Billing Survey that sets forth the customary fees charged by similar law firms in the greater Philadelphia area. (Dkt. Ent. 36; Ex. C.) The Court agrees and finds that the hourly rates charged – i.e., $440/hour (partner) and $350/hour (associate) - are reasonable rates in light of the skill and experience of the attorneys involved. (See Ex. E to Kowal Affidavit.) Notably, Plaintiff conceded the reasonableness of Defendant's rates in connection with Defendant's prior fee application in 2013, and has not opposed the instant fee application. Accordingly, the Court will award reasonable attorneys' fees in the amount of $1,200 (2.8 hours at $350/hour plus .5 hours at $440/hour).

## IV.   Summary Judgment

Turning to Defendant's summary judgment motion, summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the

14

nonmoving party." <u>Id.</u>   When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." <u>Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. <u>Anderson</u>, 477 U.S. at 252. Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. <u>Scott v. Harris</u>, 550 U.S. 373, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary

judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatte v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

## A. Analysis

Defendant moves for summary judgment on Plaintiff's claim of racial discrimination under Title VII, arguing that even if Plaintiff had met her burden of demonstrating a prima facie case of racial discrimination, she has pointed to no evidence that Defendant's legitimate business reasons are mere pretext. The Court agrees.

As an initial matter, Plaintiff's contention that she is not required to establish a prima facie case of discrimination has been specifically rejected by the Third Circuit and by well-established caselaw.[9] See, e.g., Vernon v. A&L Motors, 381 F.

---

[9] Plaintiff's cases do not support her position. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 505-06 (1993)

16

App'x 164, 168 n.6 (3d Cir. 2010). A Title VII claim for race discrimination is evaluated under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Jones v. Sch. Dist. of Phil., 198 F.3d 403, 410 (3d Cir. 1999); Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 (1981). Under that framework, once a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate business reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802–03. The burden then shifts back to Plaintiff to establish that these reasons were pretextual. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

    To assert a prima facie case of race discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action took place under circumstances that give rise to the inference of unlawful discrimination. Jones, 198 F.3d at 410-11. Defendant contends that Plaintiff cannot demonstrate that she suffered an adverse employment action or that any such action occurred

---

("The plaintiff in such a case, we said, must first establish, by a preponderance of the evidence, a 'prima facie' case of racial discrimination.").

17

because of her race. The Court addresses each argument in turn
below.

## 1. Adverse Employment Action

An actionable adverse employment action is "a significant
change in employment status, such as hiring, firing, failing to
promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in
benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761
(1998); see also Storey v. Burns Int'l Sec. Servs., 390 F.3d
760, 764 (3d Cir. 2004) ("We have defined 'an adverse employment
action' under Title VII as an action by an employer that is
'serious and tangible enough to alter an employee's
compensation, terms, conditions, or privileges of employment.'"
(citation omitted)). Furthermore, courts have held that "in
order to constitute an adverse employment action, a change 'must
be more disruptive than a mere inconvenience or an alteration of
job responsibilities.'" See, e.g., Hunter v. Rowan Univ., No.
04-1498, 2007 WL 1038760, at *5 (D.N.J. March 30, 2007), aff'd
299 F. App'x 190 (3d Cir. 2008); Smith v. Amerada Hess Corp.,
No. 05-560, 2005 WL 2897459, at *6 (D.N.J. Oct. 31, 2005); see
also Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136
(7th Cir. 1993) ("A materially adverse change might be indicated
by a termination of employment, a demotion evidenced by a
decrease in wage or salary, a less distinguished title, a

18

material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.").

Plaintiff has not established that the actions taken by Defendant constitute actionable adverse employment actions. Plaintiff appears to point to three incidents demonstrating adverse employment actions: (1) Plaintiff's receipt of a written work schedule for only two out of six work weeks while Kellum received a written work schedule for more weeks; (2) Plaintiff did not receive appropriate training for the ANM position, such as how to create schedules for those she supervised and other "[a]dministrative types of jobs" (Pl.'s Dep. 75:13-22); and (3) Plaintiff was assigned more patient care assignments consistent with a staff nurse's duties than Kellum during the relevant time period, which effectively denied her appropriate training. (DSMF ¶¶ 37, 40; PCSMF ¶ 5.)

As to Plaintiff's receipt of a more limited written schedule, this does not constitute an actionable adverse employment action. Plaintiff conceded that she had access to an electronic schedule and assumes that, had she tried, she could have accessed her complete work schedule. (See Pl.'s Dep. 69:2-25 ("I'm sure I had a password and an ID . . . .").) She did not do so because her assignment was to work on the floor with patients and not in the office. However, she does not contend

19

that she was denied access to the computer or to the office. In fact, she claims it was necessary for her to ask Farrell each day which hours she was scheduled to work. It seems that she could have just as easily logged on to the computer to view her full schedule. The "mere inconvenience" of doing so, and any associated "inconvenience" in being unable to make long-term social plans, cannot give rise to an actionable claim. <u>See Hunter</u>, 2007 WL 1038760, at *5; <u>Smith</u>, 2005 WL 2897459, at *6.

Plaintiff also fails to establish that Defendant's failure to train her in creating schedules or other administrative tasks constitutes an adverse employment action as she points to no evidence that such training adversely impacted her position. <u>See Storey</u>, 390 F.3d at 764 (adverse employment action must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment"); <u>see also</u> <u>Burgess-Walls v. Brown</u>, No. 11-275, 2011 U.S. Dist. LEXIS 94087, at *12-13 (E.D. Pa. Aug. 22, 2011) ("Denial of training is sufficiently severe as to alter the terms of a plaintiff's employment or deprive a plaintiff of employment opportunities where training is necessary for career advancement." (quoting <u>Albright v. City of Phila.</u>, 399 F. Supp. 2d 575, 588 (E.D. Pa. 2005))).

Being assigned more patient care assignments also does not constitute an adverse employment action. Plaintiff testified

20

that she was unfamiliar with the staff and procedures at the
Washington campus, and that it was Plaintiff – not Farrell – who
requested to be rotated through all of the positions that she
would be supervising. (Pl.'s Dep. 83:4-20.) Plaintiff

> thought that it would be a good idea the first week
> that I got there, if I rotated to all the different
> positions at Washington Township. A, so I could learn
> it because I had never even been through the whole ED.
> I didn't know the layout. And it would give them an
> opportunity to meet me and to see me not just as
> someone coming in new as leadership, but coming in as
> someone who is willing to help them.

(Id.) Farrell seemed reluctant at first, but then agreed to
Plaintiff's proposed rotation. (Id. at 83:21-84:4.) Furthermore,
Plaintiff acknowledged that developing working relationships
with her staff and learning the procedures at that department
were important tasks. They were also tasks in which Kellum, who
had previously performed an ANM's responsibilities and was
familiar with the Washington hospital, did not need to engage.
(Id. at 90:13-20.) In any event, the ANM's responsibilities
specifically include providing direct patient care, such as that
of which Plaintiff now complains. (DSMF ¶ 27; see generally Ex.
H (describing essential job functions of ANM).) Accordingly, the
different patient assignments – especially where unaccompanied
by a change in salary or title – cannot demonstrate an adverse
employment action. See Hunter, 2007 WL 1038760, at *5. Thus,

21

Plaintiff has failed to satisfy her burden of demonstrating a
prima facie case of race discrimination.

### 2. Inference of Unlawful Discrimination

Even if Plaintiff had demonstrated an adverse employment
action, she has failed to present evidence that "raises an
inference of discrimination." Storey, 390 F.3d at 764 (quoting
Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002)). As
Defendant points out, the defining element of a race
discrimination claim is that the conduct occurred because of the
plaintiff's race. See 42 U.S.C. § 2000e-2(a)(1). Here,
Plaintiff's claim is based upon Farrell's unfavorable conduct
towards Plaintiff during the six weeks in which Plaintiff was an
ANM, as compared to her favorable conduct toward Kellum, a white
woman also hired as an ANM. But, Farrell not only initially
hired Plaintiff (knowing her protected characteristic), but she
also "rehired" Plaintiff at least twice, supervised Plaintiff
for more than eight years during which she consistently rated
Plaintiff as meeting or exceeding expectations and praised her
work, and chose to award the first ANM position to Plaintiff
instead of Kellum even though Kellum was more qualified. (DSMF
¶¶ 11, 14, 19, 23.) Indeed, Plaintiff testified that she found
Farrell to be "supportive and understanding" during a difficult
year in Plaintiff's life. (See id. at ¶ 16.) It is illogical
that, under such circumstances, Farrell suddenly decided after

22

eight years to discriminate against Plaintiff because of her
race.[10] See Mitchell v. UBS Servs. USA LLC, No. 07-1651, 2009
U.S. Dist. LEXIS 54306, at *40 (D.N.J. June 26, 2009)("[I]t
would defy logic to conclude that [defendant] hired [plaintiff]
when the latter was 54, gave him adequate performance reviews
for three consecutive years, and then inexplicably and suddenly
developed an aversion to 58-year olds . . . .")( citations
omitted); Maidenbaum v. Bally's Park Place, Inc., 870 F.
Supp.1254, 1267 n.24 (D.N.J. 1994), aff'd 67 F.3d 291 (3d Cir.
1995) (granting summary judgment and stating that employers who
hire an applicant knowing that she falls into a protected class
will seldom be credible targets for pretextual termination); see
also Bintliff-Ritchie v. Am. Reins. Co., No. 05-3802, 2007 U.S.
Dist. LEXIS 10469, at *32-33 (D.N.J. Feb. 15, 2007) (same);
Kotakis v. Wesco Distrib., 650 F. Supp. 2d 435, 442 (W.D. Pa.
2009) (same).

    While not disputing these facts, Plaintiff argues that "a
reasonable jury could conclude, as [Plaintiff] did, that the
disparate treatment of the plaintiff was motivated by racial
discrimination" because there was "no other discernible

---

[10] In addition, Plaintiff explained that prior to Plaintiff
commencing her responsibilities as an ANM, Farrell invited her
to attend a leadership training program. (Pl.'s Dep. 64:20-
65:25.)

difference between [Plaintiff] and Ms. Kellum beside race."[11]
(Opp., Dkt. Ent. 50, at 8.) First, Plaintiff acknowledged
numerous relevant differences, other than race, between herself
and Kellum. Specifically, Plaintiff was aware that Kellum had
not only previously worked as an ANM but had also worked in the
Washington hospital ED, while Plaintiff had experienced neither.
(See DSMF ¶¶ 21-22; see also Pl.'s Dep. 58:8-59:14, 54:22-57:3.)
Second, it is well-established that a plaintiff's subjective
"belief or feeling that [s]he was the victim of disparate
treatment is insufficient, standing alone, to preclude judgment
as a matter of law." Jones, 19 F. Supp. 2d at 420; see also
Ekhato v. Rite Aid Corp., No. 12-3607, 2013 U.S. App. LEXIS
12455, at *9 (3d Cir. June 19, 2013)("Ekhato's subjective belief
that the decision to terminate her employment was discriminatory
is insufficient."); Troy v. State Corr. Inst. – Pittsburg, No.
11-1509, 2013 U.S. Dist. LEXIS 144647, at *29 (W.D. Pa. Aug. 14,
2013) (same); Brooks v. CBS Radio, Inc., No. 07-519, 2007 U.S.
Dist. LEXIS 92213, at *44 (E.D. Pa. Dec. 17, 2007), aff'd 2009
U.S. App. LEXIS 18189 (3d Cir. Aug. 14, 2009). Because Plaintiff
points to no evidence giving rise to an inference of

---

[11] See also Pl.'s Dep. 100:24-101:02 ("I do not know the
heart of another human being. I don't know their motivation. I
don't know what they're thinking. I can only tell you what their
actions felt like to me.").

discriminatory intent, she has failed to satisfy her burden of demonstrating a <u>prima facie</u> case of race discrimination.

### B. Pretext

In addition, Plaintiff has failed to adduce sufficient evidence of pretext. Where a defendant provides legitimate, non-discriminatory reasons for its action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994)). In other words, the plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons such that a reasonable factfinder could find them "unworthy of credence." <u>Id.</u> at 765 (citations omitted).

Here, Defendant contends that Kennedy tailored Plaintiff's and Kellum's schedules, assignments, and training based upon their respective experience, background, and expected duties. The undisputed facts show that Kellum had prior experience as an ANM, and was currently employed at, and very familiar with, the Washington hospital ED, while Plaintiff had no experience as an ANM or at the Washington hospital. (DSMF ¶¶ 21-22; Farrell Cert.

25

¶ 23.) In fact, Plaintiff's lack of familiarity with the staff, layout, and procedures at the Washington hospital led her to request to be rotated among the various positions that she would be supervising. It is further undisputed that the Washington hospital and the Stratford hospital from which Plaintiff came are significantly different in size, layout, and volume of patients and staff. Washington is approximately twice the size, with twice the patients and staff. (DSMF ¶¶ 9-13.) These differences provide a legitimate justification for Plaintiff's and Kellum's different training protocols and assignments.

Plaintiff attempts to demonstrate pretext by again noting her own subjective beliefs and feelings. However, as discussed above, such speculation and feelings cannot withstand summary judgment. See, e.g., Jones, 19 F. Supp. 2d at 420. This is especially so where, as here, the alleged discriminatory conduct was carried out by a supervisor who had consistently supported and encouraged Plaintiff for more than eight years. See Mitchell, 2009 U.S. Dist. LEXIS 54306, at *40. Ferrell's prior actions towards Plaintiff belie any kind of discrimination towards the Plaintiff and therefore undermine Plaintiff's assertions of pretext.

**V. Conclusion**

In sum, for the reasons stated above, the Court denies Defendant's motion to strike Plaintiff's opposition memorandum

26

but awards attorneys' fees to Defendant in the amount of $1,200.

In addition, the Court grants Defendant's motion for summary

judgment and dismisses Plaintiff's claim.


Date: July 30, 2014

                                    s/Renée Marie Bumb
                                    RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE